### In re EAGER'S WILL.

(Supreme Court, Appellate Division, Second Department. June 22, 1909.)

Appeal from Surrogate's Court, Orange County.

In the matter of proving the last will and testament of Samuel W. Eager, deceased. From a decree refusing to admit the will to probate, the proponent appeals. Affirmed.

Argued before HIRSCHBERG, P. J., and WOODWARD, BURR, RICH, and MILLER, JJ.

M. N. Kane, for appellant.
Henry Bacon, for respondents.

PER CURIAM. Affirmed, with costs.

BURR, J. (dissenting). Samuel W. Eager died February 5, 1907. He left a paper, dated April 21, 1899, purporting to be his last will and testament. It is not denied that this paper was executed by him on the day of its date in the presence of two witnesses and with all the formalities prescribed by the statute. After a long contest, this will was denied probate by the Surrogate's Court of Orange county, upon the ground that at the date of the execution thereof the said Samuel W. Eager was not possessed of testamentary capacity, and that his signature thereto was obtained by undue and improper influences exercised over him by his son. The provisions of this will are exceed-

ingly simple. By it the sum of $2,000 is given to each of his daughters, Mary B. Roosa and Ida S. Galloway. The residue of his property is given to his son, Samuel W. Eager, Jr., who is appointed executor. The entire estate, consisting of personal property and a farm situated in Orange county, is valued at between $20,000 and $25,000. Decedent's daughters were married in October, 1891, and went to live in Pennsylvania. He remained with his son upon the farm where he had lived for many years.

The paper offered for probate was executed under the following circumstances: On the day of its date Mr. Eager drove from his farm at Neelytown to Montgomery, a distance of four miles, and there went to the office of an attorney. He was alone. Some days before that he had met the attorney in the street of the village and told him that he was coming into his office to have him draw a will for him. On the day in question, after an interview with the attorney, the paper offered for probate was prepared and read over by the deceased. He was then told that it would be necessary to have two witnesses, and he went out and secured the attendance of two friends of his, business men of the village, whose places of business were about a block distant. One of them he had known for 30 or 40 years; the other, for 25 years. Each of them had transacted business with him. Each of them testified, not only as to the formalities of execution, but also that Mr. Eager was of sound and disposing mind and memory. After it had been executed, the paper was placed in an envelope by the attorney and handed to Mr. Eager, who put it in his pocket and took it away. According to the testimony of the proponent of the will, it was found in a desk used by the decedent a short time after his death.

The paper executed on that day was an exact duplicate of another paper executed by Mr. Eager on April 24, 1894, except that the subscribing witnesses were different. That paper was executed under the following circumstances: On the morning of the day mentioned, Samuel W. Eager, Jr., told George W. Pitts, a neighbor, that his father was ill and that he wished him to go to Goshen, about eight miles distant, and secure the attendance of Mr. Mills, an attorney having an office in that place, who had transacted business for the elder Eager for a number of years. Mr. Mills and Mr. Pitts returned together, reaching Mr. Eager's house about noon. Mr. Mills went into the room where he was sitting, inquired after his health, and asked him what he wanted him to do. Mr. Eager replied that he wanted him to draw a will for him. The son then brought a pen and ink. Mr. Mills had a blank form for a will with him. After this the son left the room, and no one was present with Mr. Eager except Mr. Mills. He testifies that instructions as to the disposition of his property and the names of the objects of his bounty, together with the names and addresses of the husbands of his daughters, were given to him by Mr. Eager. He then drew the will in accordance with these instructions, and, after it had been written, read it aloud, and then handed it to Mr. Eager, who read it himself. He then stated that he wished Mr. Mills and Mr. Pitts to act as witnesses to the will. Mr. Pitts was called in, and the paper was then signed and executed, after

which it was handed to Mr. Eager, who said that he would put it in the safe in the hall, or give it to his son to put in the safe in the hall. Mr. Mills further testifies that after that Mr. Eager, his son, the housekeeper, Mr. Pitts, and he went into the dining room and had dinner together, after which he returned to his office.

In an effort to defeat the probate of the will offered and executed in April, 1899, the daughters of the decedent introduced evidence to the effect that almost immediately after the execution of this paper in April, 1894, Mr. Eager became violently insane. There was some evidence of eccentric conduct on his part just before that date, and it was conceded that his illness was the occasion for sending for Mr. Mills. On the 5th of May, 1894, he was taken to the Hospital for the Insane at Middletown, where he remained until June 20, 1894, a period of a little more than six weeks. While there he seemed to improve, and according to the hospital records during the latter part of his stay his mind was clear for days at a time and he had no hallucinations. He was discharged as improved, although not entirely cured. After his discharge he went with his daughters to their home at Great Bend, Pa., remained there about four weeks, and then returned to his home alone. On July 10, 1901, more than two years after the execution of the paper which was denied probate, he was returned to the hospital, where he remained until his death on February 5, 1907. That his mind was diseased during the latter period is not questioned. His disease was diagnosed as senile dementia, produced by hardening of the arteries, and this diagnosis it is claimed was confirmed by an autopsy performed after his death. The mere fact that a person may suffer at times from delusions or hallucinations, or that his bodily or mental powers may be impaired, will not establish testamentary incapacity, if such person had sufficient intelligence to comprehend the condition of his property and the scope, meaning, and effect of the provisions of his will. Matter of Snelling, 78 Hun, 211, 28 N. Y. Supp. 942, affirmed 145 N. Y. 599, 40 N. E. 165; Dunham v. Dunham, 63 App. Div. 264, 71 N. Y. Supp. 330; Matter of Lawrence, 48 App. Div. 83, 62 N. Y. Supp. 673; Matter of Donohue, 97 App. Div. 205, 89 N. Y. Supp. 871.

It would be impossible, within the limits of an opinion, to review and analyze all of the testimony offered upon the part either of the contestants or the proponent, making a record of several hundred pages. Outside of the medical experts, 14 witnesses were called for the contestants, who testified to various acts indicating delusions and hallucinations on the part of the decedent at various times between 1894 and 1901, when he returned to the asylum. Some of these manifestly occurred at a period subsequent to the date of the alleged will. Several of these witnesses admitted that Mr. Eager both talked and acted rationally for a greater part of the time. That he was cognizant of the fact that he had executed the paper which was offered for probate as his will under the circumstances above set forth is established, not only by the testimony of the draughtsman of the will and the subscribing witnesses thereto, but by one of the principal witnesses for the contestants, who testifies that he told her about it

upon his return and gave as a reason for making a will in 1899, which was an exact duplicate of the one made in 1894, that Mr. Pitts, one of the witnesses to the former will, had quarreled with his son and was hostile to him. It is true that after making the will of 1894 he denied to his daughters that he remembered making such a will; but this was at a time when they were finding fault with him respecting its provisions, which they claimed that they had been informed of by their brother. There was evidence that the decedent was addicted to some extent to the use of intoxicating liquors, which may have accounted for some of his outbreaks within the period named.

Upon the part of the proponents, beside the subscribing witnesses to the two wills, more than 30 other witnesses were called, including the president and cashier of the bank where he transacted business, the commissioner of highways, the former surrogate of the county, and business men and neighbors. From their testimony, if accepted, it would appear that after his discharge from the asylum in 1894 down to a period considerably after the execution of the will of 1899 he attended to the sale of milk from his farm, to the purchase of feed, flour, coal, and lumber, drove about the country alone in transacting his business affairs, loaned money, collected interest upon the loans and the principal when due, bought and sold stocks and bonds, discussed the wisdom of his purchases, ordered and superintended repairs to buildings upon his farm, read the daily papers, intelligently discussed the political situation, discussed the market rates for the sale of cattle and the best time for shipping the same, conversed with the highway commissioner as to the repairs to a bridge over the stream, and made suggestions of sufficient value to be accepted by him in connection therewith, voted at the elections, worked upon his farm, settled up the affairs of his sister's estate, accounting in the Surrogate's Court and there being examined as a witness, united with his two daughters, the contestants here, in a conveyance of a farm formerly belonging to his wife to the son, who is the chief beneficiary under his will, and that at a price, as he stated, in excess of the actual value of the land, and generally attended to his business affairs.

The evidence of undue influence in connection with the execution of this will is exceedingly meager, and consists principally of statements made by one of the principal witnesses for the contestants, at that time acting as housekeeper for the decedent, that his son Sam had given him no peace until he made his will. Where, on an appeal to the Appellate Division from a decree of the Surrogate's Court, made in a proceeding for the probate of a will, it appears that the disposition which should be made of the questions of fact presented by the evidence given is not free from doubt, and the result reached in the Surrogate's Court is not entirely satisfactory, the Appellate Division will send the case to a Trial Term for a jury trial. Matter of Warnock, 103 App. Div. 61, 92 N. Y. Supp. 643; Matter of Finch, 115 App. Div. 871, 101 N. Y. Supp. 135; Matter of Tompkins, 69 App. Div. 474, 74 N. Y. Supp. 1002.

It seems to me that this is pre-eminently a case which should be passed upon by a jury, and that under all the circumstances justice

requires that the decree of the Surrogate's Court, appealed from, should be set aside, and a new trial ordered in the Supreme Court before a jury.

RICH, J., concurs in the dissent.